## LUCAS *v.* BARRETT.

A court of equity will not impart force to a defective title, when by doing so, other persons having a prior equity in the land would be injuriously affected.
A contract to sell land will not be enforced if made by an agent invested with

merely verbal and limited authority, to show the land and state the prices; with the avowed understanding that his arrangements or bargains to sell, should be subject to the approval or disapproval of his principal; and he refused to confirm the sale.

Declarations by an agent of limited powers, not made at the time nor respecting the subject matter in controversy, cannot bind the principal, especially where those declarations were of a vague, indefinite character, and in conflict with testimony of a higher and more direct character.

A contract should be just, reasonable, and founded upon a consideration nearly adequate, in order to justify an enforcement by a court of equity.

Where an agent makes a contract in his own name, he cannot, after his principal refuses to ratify it, make him responsible by changing the contract, in signing his name as principal and his own as agent.

IN EQUITY. *Appeal from Muscatine District Court.*

*Wm. G. Woodward,* for the appellant. *First.* It is said that these lands were under contract of sale by title bond, to D. R. and A.. O. Warfield. In answer to this, we refer to the following facts: 1. These lands were advertised for sale in Nov., 1841, in a list of land, particularly describing them. Whether through mistake, or to urge the purchasers to payment, we care not. The only fact we have to do with is, that they were advertised.

2. They were contained in the list given by Barrett to Stuart, of lands to be sold.

3. Mr. Starr, one of the attorneys with full powers, offered to sell some of these same lands to Robert Davis, a little after the sale of Stuart to Lucas, and Davis would have bought them, had they not just been sold to Lucas.

4. The Warfields considered and supposed their contracts at an end, on account of the above.mentioned advertisement of them for sale, and the other circumstances; and we hold that the above facts do constitute a disaffirmance of the sale to the Warfields, and were so "*de facto.*"

*Second.* The next subject of defence is the statute of frauds, and the form of the instrument; they holding that it is, in its tenor only, the private contract of Stuart. 1. As to the statute of frauds, the proper attachment to the bill is the contract, and so is in writing. 2. The form of the con-

tract. It shows upon its face that the land is Barrett's, for the deed is to come from him. Barrett admits throughout that Stuart was his agent, but only pretends he exceeded his authority. B. admits the contract was made by Stuart for him, and gives his reasons why he will not comply with it. These things show clearly enough that the contract was not made by Stuart as his, but as agent for Barrett, and that B. has all along so regarded it. Who then can doubt that it is B.'s contract, if made within the authority of the agent. He was held out to the world as Barrett's general agent, and this gave him, of course, all the usual means of making and effecting the contract—of carrying out the objects of the agency.

See Story on Agency, 58, 59, 60, 73, 79, 87, 91. . On page 70, he says: " But by far the most numerous cases of agency arise, not from formal or informal written instruments, but from verbal authorization, or from implication, from the particular business or employment of the principal or agent," &c. " In all such cases, whether the agency be of a special or of a general nature, it may also be laid down as a universal principle, that it includes, unless the inference is expressly excluded by other circumstances, all the usual modes and means of accomplishing the objects and ends of the agency. And even a deviation by the agent from the appropriate course, will not vitiate his act, if it be immaterial or circumstantial only, and does not in substance exceed his right and duty."

This is an exact description of the present case. Stuart, being the agent, was possessed of the proper authority as to mode or means. Other passages in the same writer, (see the pages quoted above,) carry the idea that an agency carries with it the power to do all things required by the law, or the usages of trade, &c., to effect his objects.

Thus, Stuart was empowered to make a written instrument, to make the contract good within the statute.

But it has been argued, this instrument is not sufficient, it

is too informal, it does not express itself to be in the name of the principal.

The principle is somewhere held and set forth, that this strictness of form is not to be rigidly exacted, except in those cases in which the law demands the observance of a particular form. And further, it is correct law, that a court of equity does not require the same strictness of form which a court of law claims. Equity seeks the substance, and not the shadow.

For similar ideas, see Story on Agency, pp. 77, 143–145, 150–152. On p. 141, after speaking of deeds and other sealed instruments, he says, "But when an act is to be done *in pais,* or in any other manner than by a written instrument under seal, then the act will be so construed, if it may be, as most effectually to accomplish the end required by the principal."

*James P. Carleton,* for respondent. Argument submitted prior to his election to the office of district judge.

The counsel for the appellant is mistaken if he supposes that it will be contended that private instructions are to control a general agency. No such doctrine will be advocated. But it is insisted, that the establishment of a general agency upon the part of Stuart, will not entitle the appellant to a decree, upon the instrument set forth in his bill. It is admitted, that there are numerous cases in which equity will aid the defective execution of a power—that it does not look so much to the *form* as to the *substance ;* but in all such cases, it must clearly appear from the writing, that the party intended to execute the power. See 1 Story's Equity, 185, § 172. Admitting, for the sake of the argument, that Stuart was the general agent of Barrett for the sale of those lands; in that capacity he had the *power* to bind him by a contract reduced to writing, and properly framed, or even defectively executed, provided the writing on its face showed an intention to execute his power in making a contract binding upon him. To possess a power, and to exercise it, are

33

t.vo different things, and a court of equity will not infer its exercise, though the right be proved, unless the instrument itself clearly shows it. Nor will it allow oral testimony to be introduced to establish the fact. The reason : the instrument showing that he acted individually, and not in the exercise of a power granted to him, to allow oral testimony to be introduced would be to vary the written instrument. Upon this point, courts of equity are as tenacious as courts of law. To apply these principles to the instrument before the court. Does it show upon its face, an intention upon the part of Stuart to execute the power given to him by his agency, so as to bind Barrett ? Does he represent himself anywhere in it as agent ? Does he attempt to bind Barrett to do an act ? He represents himself as receiving the money in full pay for certain lands,—that he (Stuart) is to procure a good and sufficient deed, from Richard F. Barrett to Joseph Lucas of Ohio, to be made, &c. ; nothing said of agency, or of Barrett being bound to make a deed. But in order to present this matter in a still stronger light, (and it is the true light in which to view it,) take the instrument, unconnected with any testimony, going to establish an agency, and would the court infer from the face of the instrument, that Stuart was an agent, or that by the instrument itself he intended to execute a power ? The only fair construction that could be placed upon it would be, that Stuart was acting for Lucas in purchasing the land from Barrett. The mistake of the appellant consists in this ; he supposes that by establishing a general agency upon the part of Stuart, it must necessarily follow that the instrument in question must be binding upon Barrett, forgetting that he is bound to go a step further and prove that Stuart, in the execution of the writing, intended to exercise his *power* of agency. To do this, parole testimony must be introduced, because the instrument itself shows no such intention. This cannot be done, for the reason that it violates a principle recognized both by courts of law and equity,—to wit, a written instrument cannot be contradicted by oral testimony.

Lucas *v.* Barrett.

This court will not allow a party to come in and by parole testimony make that the contract of one, which, on its face, bears no marks of being his. Again, is this instrument defective, or informal? If so, in what? It is signed by Stuart,—it binds Stuart,—the name of no other person sought to be bound is mentioned in such a way as to infer that Stuart is representing him. Why should not the court, taking the writing as their guide, as soon say that Stuart was the agent of Lucas as of Barrett?

But it is said, it appears upon the instrument that it is Barrett's land; therefore Stuart intended to bind him. This syllogism, tested by the rules of logic, would hardly be pronounced a sound one. At any rate, it would be no sounder than the following:—Stuart received the money of Lucas in pay of certain lands, and was to procure a deed from Barrett in ten days, therefore Stuart was the agent of Lucas. The court will discover too, from all the authorities introduced by the appellant, that it appeared from the face of the instrument itself, that the party signed his name as agent of his principal, evidently showing that he intended to execute his power. And perhaps the strongest authority cited by the appellant, is to be found in Story upon Agency, 152, § 162, in which the following language is used, " Indeed, it may be asserted as a general rule, that in all cases, when an agent has contracted within the sphere of his agency, and the principal is not bound by the *form* of the contract *at law*, a court of equity will enforce it against the principal, upon principles *ex æquo et bono*." This, standing alone, might appear to favor the position contended for by the appellant; but when it is taken in connection with preceding pages, as far back as page 136, together with the principle of equity before referred to in 1 Story's Equity, 185, § 172, it is believed it will be found that it is not the intention of the author to carry the principle (as to the enforcements of such contracts) any farther than what has been contended for by the appellee. Most, if not all of the instances cited by the author in the pages before referred to, are cases in which the instruments

were informally executed, but in all it appeared from the face of the instrument itself, that the agent intended to execute his authority, and by his act to bind the principal. In all such cases, the only question for the court to determine is, whether the agent acted within the scope of his authority in making the contract. Parole testimony, (if it be in a case where an agent might be appointed verbally,) for establishing that fact, would not contradict the instrument. Indeed, the language of the quotation itself shows, that the author was referring to instruments informally executed, " and the principal is not bound by the *form* of the contract *at law*." There must be some basis laid for equity to take hold of the contract, and that must be in the writing. It is the intention of the parties upon which it operates, and that intention must be gathered from the face of the writing. If, therefore, it does not appear in the writing, that the party intended to bind his principal, no testimony can be received to establish that fact; because, in doing so, the court would, by oral testimony, make that the contract of one man, which, by writing, appears absolutely to be the contract of another. This cannot be done, either in law or equity. See 11 Mass. 27; 2 Story's Equity, 76, § 767.

But again, it is contended that this contract should not be specifically enforced, on the ground that it comes within the statute of frauds. The arguments in support of this position, are to be found under the second point made by the appellor in this case. To make it a contract binding upon Barrett, parole testimony must be introduced to show the intention of Stuart at the time he entered into the contract, and also the character in which he contracted. On its face, it is Stuart's contract absolutely. No court can infer anything else. To make it Barrett's contract, the instrument must be contradicted, and that too by oral testimony. In other words, a new contract must be made out by parole proof, which certainly contravenes the provisions of the statute of frauds. See 2 Story's Equity, 76, § 767. In connection with this we may observe, that parole testimony will not be received to prove

that Stuart was an agent in opposition to the writing.   See 11 and 12 Mass. before cited.   This rule prevails also in equity.  2 Story's Eq. 76, § 767.

Again, this contract should not be enforced, on the ground that it would be inequitable.   1. Because there is an outstanding equity in favor of one of the Warfields.   This land, the court will discover by the testimony, was sold to Warfield, 26th October, 1839, for six hundred and ninety-one dollars thirty-nine cents, payable in five years, in five equal annual instalments.  If the said sums were not paid punctually, at the time and places specified, the said Barrett reserved to himself the right " to ratify or confirm this agreement or not."   The sale was made to Lucas by Stuart, May 4th, 1842, before the expiration of the five years, and before any act upon the part of Barrett, showing his intention to rescind the contract.   Warfield had an equity; unless the contract was disaffirmed.   Suppose that Warfield, even after the advertisement, had tendered Barrett the amount of the purchase money, with interest, and demanded a deed, and Barrett had refused, would not a court of equity have compelled a specific performance?  We think it would, and for this reason.   Barrett was in possession of Warfield's notes,—Warfield, of his bond and land : no notice had been given him of his intention to rescind the contract by delivering up, or an offer to deliver up, the evidences of that contract.   The presumption arising from these facts would be much stronger, that he did not intend to rescind, than the one arising from the advertisement that he did, and the court, acting upon this, would carry out the contract.   Indeed, to view the advertisement in the strongest light, it could only be considered as manifesting an *inchoate* intention, which might or might not be perfected, according as Barrett did or did not deliver up the notes, and notify Warfield that the contract was at an end. Barrett could not bring his action to recover the possession of the property, without giving Warfield notice ; and why ? Because of the contract.   Would the advertisement be considered as notice?   Certainly not.   And how then could it

be considered as a disaffirmance of the contract; and this contract to this day, from aught that appears before the court, is unrescinded.  The court never will lend its aid to carry out a contract defectively executed, when such aid would, under all the circumstances, be inequitable to other persons, or be repelled by a counter equity.  See 1st vol. Story's Equity, 181, § 169.

2d. It is inequitable, because of inadequacy of price. There are two hundred and forty acres of land—cost, $300; worth, according to testimony, $4.50 per acre—making in all, $1080.  Lucas gave $400 in Illinois bank paper, worth, according to the testimony of Isett, at that time, from 40 to 45 cents on the dollar, making $180,—one hundred and twenty dollars less than the original cost, and nine hundred dollars, or six times less than the real value; and placing Illinois paper at its face, it is a little over two and a half times less than the real value.  How far inadequacy of price, *per se*, is sufficient to prevent a specific performance, seems to be somewhat unsettled.  Story, in his Commentaries on Equity, vol. 2, 79, § 769, says, " An agreement, to be entitled to be carried into specific performance, ought to be certain, fair, and just in all its parts."  Chief Justice Savage, in the case of *Seymour* v. *Delaney*, 6 Cowen, 517, after examining some of the principal cases upon this point, states that the question, (that is, inadequacy of price being sufficient to prevent a decree for specific performance,) " is one upon which very great men have differed, and have administered the equity of the court upon diametrically opposite principles.  The one class maintain that the court will not lend its aid to enforce the performance of contracts, unless they are fair, just and reasonable, and founded on *adequate consideration.*  The other class maintain that unless the inadequacy of price is such as shocks the conscience, and amounts in itself to decisive and conclusive evidence of fraud in the transaction, it is not of itself a sufficient ground for refusing a specific performance."  After mentioning many distinguished names that have taken sides upon this ques-

tion, the chief justice himself decides in favor of those who maintain that the contract should be fair, just and reasonable, and founded on adequate consideration.   And although in the final determination of the court, an opposite view was taken, and in favor of the inadequacy of price being such as shocks the conscience and amounts to conclusive evidence of fraud, yet from the review which is taken of the cases and the names given, it is evident that the weight of authority is in favor of the position occupied by the chief justice.   But whichever view of the question this court may take, it cannot affect the position occupied by the appellee.   For surely if there ever was a case in which the gross inadequacy of price would be evidence of fraud, it must be this.   The price given is six times less than the value.   The conscience of any indifferent man, however elastic it might be, would certainly be shocked at this inadequacy.   But when this is taken in connection with the peculiar circumstances which surround this case, the reason for refusing a specific performance becomes still stronger.   The fact that Barrett himself did not make the contract—the doubts which hang around the character and extent of the authority of Stuart, (if authority he had)—the character of the contract itself, being the individual contract of Stuart, and binding on him alone—the outstanding claim of the Warfields—the relation which the contracting parties on the one side sustained to the Warfields—the promise made by Mrs. Steinberger to Barrett, to purchase a portion of these lands at least, for the benefit of her son-in-law—these taken in connection with the gross inadequacy of price, certainly present sufficient reason for the decree of the court below, and sufficient to justify this court in affirming the same.   The decreeing a specific performance is a matter of discretion with the court, and not of absolute right.   Hence Story (2 Story's Equity, 79, § 76) says " it requires a much less strength of case to resist a bill to perform, than to enforce a specific performance.   Courts of equity will not decree a specific performance in cases of fraud, or of *hard* and *unconscionable* bargains, or where the

decree would produce *injustice;* and generally not in cases where it would be inequitable under all the circumstances." In view of all the circumstances connected with this case, there can be but one opinion, and that is, it would be grossly inequitable to compel Barrett to convey this land to Lucas. Lucas has lost nothing by the transaction. He never was in the possession of the land ; his money was tendered back to him, according to the testimony of Stuart, and in pursuance to the contract, as he, Stuart, understood it, so that Lucas may be viewed as standing *in statu quo.* To decree a conveyance now, would be to take the land from Barrett, under, as he contends, an unauthorized act upon the part of Stuart, at one sixth of its real value, and under circumstances which induce a strong suspicion of collusion upon the part of those who seek to become the owners of the different tracts of land alluded to in the depositions.

There is one other point to which it may be necessary to refer the court more particularly, and which, it is believed, constitutes one of the strong points in the case.

The contract, it will not be contended, at the time of its execution, was either in law or equity binding upon Barrett. It had not then the appendage, "agent for Richard F. Barrett." On its face then it was the contract of Stuart, and if it proved any agency at all, it proved that Stuart was agent for Lucas. And although Stuart was in fact the agent of Barrett, and had the power to dispose of the lands mentioned in the bill, yet according to the law already referred to, parole testimony could not be introduced to show that fact. The instrument, without the *appendage,* shows no intention upon the part of Stuart to execute a power. Now it is admitted that if Stuart possessed the power of disposing of those lands, the contract might have been put in proper form, (if in the making of the contract he intended to act as agent,) prior to an express refusal upon the part of Barrett to carry out the contract, and that refusal being made known to the parties concerned. In this case, according to deposition of Lucas, page 14, and deposition of Stu-

Lucas *v.* Barrett.

art, page 40, there was a refusal upon the part of Barrett to carry out the contract as signed by Stuart, and this fact was communicated to both Lucas and Stuart. This then was an express revocation of Stuart's agency, if agency he had, so far as this particular land was concerned; and the contract in the first place not being binding upon Barrett either in law or equity, after the refusal to ratify such a contract, Stuart had no right to turn around and make a contract binding upon Barrett, which he had expressly refused to sanction. His agency to make such a contract was at an end, so that the appending of " agent for R. F. Barrett," by Stuart, imparted no virtue to the contract. This view is supported by authorities cited above.

*Opinion by* GREENE, J. The bill in this case was filed by Lucas against Barrett. It states that in May, 1842, the defendant was seized in fee of certain lands, and had employed one R. Stuart to make bargains for the sale of the same ; and who accordingly made an agreement with complainant to sell him the land in question, upon the terms and conditions stipulated in a written memorandum or receipt, of which the following is a copy :

" Received of Samuel Lucas four hundred and eighty dollars, in full pay for the north-west quarter and the west half of the north-east quarter of section two, township seventy-six north of range three, west of the fifth meridian. In consideration of the above-named sum I am to procure a good and sufficient deed from Richard F. Barrett, to Joseph Lucas of Ohio, to be made within ten days from this date.

ROBERT STUART,

*May* 4*th*, 1842.          Agent for Richard F. Barrett."

The bill alleges a peremptory refusal of defendant to make a deed for the land in accordance with the receipt ; and concludes with the usual prayer for a decree of title to the premises.

The answer, in substance, assumes, and places the defence upon, these grounds:

First. The land described in the bill had been previously sold to one Warfield, and did not belong to defendant; that Stuart had no authority to sell it; and that even if the land in question had been subject to sale by Stuart, he contracted it for less than the original, or required price, and in that acted without authority.

Second. Stuart sold subject to defendant's ratification; which ratification had been uniformly refused.

Third. The receipt from Stuart was originally executed in his own name and individual capacity; and after the defendant refused to ratify the sale, complainant induced Stuart to add to his own signature the words, " Agent for Richard F. Barrett :" and charging that the receipt is not the defendant's, and that he is not bound by any of its stipulations. In the district court the bill was dismissed, and a decree rendered for respondent.

1. As this case more appropriately turns upon other points, we shall but briefly notice the defence set up, on the strength of Warfield's outstanding equity. It appears that the land in question was sold to him in October, 1839, for $691.39, payable in five equal annual instalments. In case of failure in payment, Barrett reserved to himself the right to ratify or revoke the agreement at pleasure. But Stuart agreed to sell the land to Lucas before the expiration of the five years, which was Warfield's time for payment, and before there was any act on the part of Barrett, showing his intention to rescind the contract, except by an advertisement in which the land appears to have been offered for sale by Barrett; and that, it is claimed, was done inadvertently and through a mistake. If, as may well be inferred from the testimony, the contract with Warfield had not been disaffirmed, he unquestionably had an equity in the land, and might have secured title by payment of the purchase money. This contract appearing to have been in force at the time of the sale made by Stuart, we should in

Lucas *v.* Barrett.

our decision be governed by the principle that a court of equity will not impart vitality and force to a defective contract, when, by doing so, other persons, having prior equity, would be injuriously affected.

The next position assumed by the respondent, that Stuart had no authority as agent to sell the land, involves the leading question in this case; and it is one upon which there is much conflicting testimony. But we find the answer too well sustained by corroborating proof to leave much doubt upon our mind, as to the nature of the agency. It was evidently of a very limited character, investing no authority to make absolute sales or conveyance of lands. He appears to have been empowered merely to show the lands, state prices, and leave the bargains and sales subject to the approval or disapproval of his principal; and even this authority was only given by verbal arrangement, Stuart having no power of attorney or other written instrument constituting him Barrett's agent, though he had received letters requesting him to sell lands, at stipulated prices, with the understanding that if the sale gave satisfaction the title would be conveyed by Barrett to the purchaser; and if not, the money would be refunded. In this instance, the transaction was unqualifiedly rejected, the money refused and ordered to be returned to Lucas. It appears too that Stuart informed Lucas and all with whom he did business for Barrett, of the limited agency or authority under which he acted. Though there is conflicting testimony in relation to these facts, still we can but regard them as established by a decided preponderance of legitimate proof. The plaintiff undertakes to show Stuart's agency from his declarations and the understanding of the neighborhood. But the declarations proved were of too vague and indefinite a character to have much bearing, especially against testimony of a higher and more direct nature. Nor were they the declarations of an agent, made under circumstances which could bind the principal. They do not appear to have been made respecting the subject matter in controversy, and at the

time of the contract, constituting a part of the *res gestæ*: see Story on Agency, § 134 and 135.

To admit the declarations of an agent not made at the very time of the contract, and in relation to it, would be going beyond the known rules of evidence, and might result in great injustice. What one man says, not upon oath, can hardly be regarded as safe or reliable evidence against another; unless the former acts within the scope of authority as an agent, and what he says constitutes the agreement of the latter as principal. As the declarations of Stuart constituted no part of the contract in this case, we cannot consider them entitled to much weight as evidence. Nor do we regard the understanding of the neighborhood as sufficient to establish a general agency, especially when, as in this case, uncorroborated by direct proof, and unconfirmed by relative situation of parties, or by special circumstances and course of dealing, or by recognition.

To sustain the bill and justify a specific enforcement of the instrument made by Stuart, against Barrett, a general agency to sell his lands should be more clearly established in Stuart; or else it should definitely appear that he was authorized as special agent to sell the land in question. In either case the proof should show an agency with sufficient authority to make an absolute sale of the land; and also that the contract was made by the agent in the name of the principal: if otherwise, he cannot be regarded as legally and equitably liable. But the agency and transaction at bar fall far short of these rules; as appears by respondent's answer, the concurring evidence of the agent himself, and the testimony of Grimes, and Starr, and other witnesses, together with the peculiar nature of the contract. All these show conclusively that Stuart's agency was of a very limited character, extending no authority either general or special, direct or implied, to make an absolute sale of the land; and that his arrangements were all made subject to the avowed condition of his principal's recognition and approval.

Lucas *v.* Barrett.

Again, it is contended for the respondent, that, even if the land had been subject to sale by Stuart, he contracted it for less than the required price, and in that acted without authority. The money received by Stuart was, it appears, Illinois paper, which at that time was not worth half its face; and besides, the land was sold for less than the stipulated price, even if the funds paid had been estimated at par value. The required price of the land was $2.81¼ per acre— making the two hundred and forty acres amount to six hundred and seventy-five dollars. But Stuart's arrangement with Lucas required only four hundred dollars for the land, in Illinois bank paper; which in real value was less than two hundred dollars for property proved to have been worth over a thousand. This inadequacy of consideration throws an inequitable color upon the transaction, and gave Barrett just cause for the exercise of his reserved power of disaffirming the contract.

It can hardly be expected that a court of equity will lend its aid to enforce a performance, unless the contract appears fair, just, reasonable, and founded upon what may be regarded as near an adequate, or at least an honest consideration; *Seymour* v. *Delaney,* 6 Cowen, 517. Story, in his Commentaries on Equity, vol. 2, § 769, says, "An agreement, to be entitled to be carried into specific performance, ought to be fair, and just in all its parts. Courts of equity will not decree a specific performance in cases of fraud or mistake, or of hard and unconscionable bargains."

2. The fact has already been adverted to, that Stuart sold subject to the ratification of respondent. This was not only responsively averred in his answer, but distinctly sworn to by Stuart and other witnesses. It appears to have been admitted by Lucas to Barrett in St. Louis, when the former requested a ratification of the contract, which was refused. On this point Stuart testified as follows: " All the sales I made for him, I made supposing they would be subject to his ratification; some he ratified, and some he did not." He also testified that he made the limited nature of his au-

thority known to Lucas at the time of the agreement; and agreed to furnish a deed only in the event that Barrett would affirm the sale. Upon this point there is strong corroborating testimony ; while it is contradicted only by proof of very questionable relevancy and admissibility.

3. It is contended that the receipt or instrument, which the bill prays to have enforced against Barrett, was not executed by Stuart in the capacity of agent, but in his own name, and upon his own responsibility; and that after the refusal to ratify the sale, Lucas induced Stuart to add to his own name the words, " *Agent of Richard F. Barrett.*" This fact is well established by testimony. If the original contract was not made with Stuart as agent, but with him in his individual capacity only, the addition of " *Agent, &c.,*" after the respondent refused to ratify the sale, cannot change the character of the contract, nor divert the liability from Stuart to Barrett. Unquestionably the contract might have been put in proper form, if the agent possessed the power to sell the lands, and if in the contract it was understood and intended by the parties concerned that he should act as agent, in case it had been done prior to an express refusal on the part of the principal to carry out the contract. He having refused his sanction when the instrument showed no intention to execute a power, and having virtually revoked the agency—at least so far as that transaction was concerned—Stuart had not even a show of authority for disregarding the revocation, and attempting to make a contract binding upon Barrett, which was of force only against himself.

Viewing this case in all its bearings, we cannot do otherwise than affirm the decree of the district court.

Decree affirmed.